NOT DESIGNATED FOR PUBLICATION

No. 125,022

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DONOVAN M. HARRINGTON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Submitted without oral argument. Opinion filed December 29, 2023. Conviction affirmed, sentence vacated, and case remanded with directions.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and HILL, JJ.

PER CURIAM: This is Donovan Harrington's direct appeal of his voluntary manslaughter conviction. A jury found him guilty based on an unreasonable but honest belief in the necessity of using deadly force. To us, he argues insufficiency of the evidence, instructional errors, prosecutorial error, and a sentencing error. After our review of the record, we find no reversible error concerning Harrington's conviction, but we vacate his sentence and remand for resentencing.

Early on the morning of August 17, 2020, Harrington, Neosha Allen, and Jewel McCammon were in a room at a Comfort Inn in Wichita, Kansas. They were using methamphetamine. McCammon was Harrington's girlfriend. Allen had known them for a couple of weeks. Harrington knew Allen's mom. Allen's mom had helped raise him. Harrington felt protective over Allen.

Miguel Tapia, a friend of Allen, contacted Allen and asked for gas money. Allen agreed to give him gas money but decided to go with him to the gas station so she could get change. Allen asked Harrington to ride along because Tapia made her feel uncomfortable. Tapia wanted to "hook up" with Allen, but Allen had no interest in doing so. Harrington did not know Tapia. Harrington and McCammon rode along to the gas station, about a mile from the hotel. Tapia drove. Allen sat in the front passenger seat while Harrington and McCammon rode in the backseat of the Pathfinder.

Tapia filled the car with gas. When he returned to the vehicle, Tapia and Allen began arguing because Allen wanted to go back to the hotel and Tapia wanted the passengers to stay with him. Tapia cussed and yelled at Allen. He was angry and aggressive. He had been using methamphetamine. He did not, however, strike her or display a weapon.

Tapia drove down Rock Road as the three passengers told him to take them back to the hotel or let them out of the vehicle. Tapia became more irate. Allen testified Tapia drove fast and jerked the wheel, weaving in and out of traffic. Tapia was texting on his phone. Allen thought they were going around 60 mph. Everyone was trying to calm Tapia down. Harrington told Tapia to "calm down" and "[y]ou don't need to talk to [Allen] like that." Tapia challenged Harrington to a fight. Allen testified Tapia threatened to get his "crew." (Tapia actually said "gang.") Tapia said he did not have anything to live for. He threatened to kill the passengers by crashing the car.

2

Tapia turned onto a residential street. He drove slower but was more argumentative and irate. Tapia took his hands off the wheel and turned toward Allen. He tried to grab her face. Harrington tried to get between them. There was a car coming toward the Pathfinder. Harrington fired his gun three times into Tapia's right upper back. Harrington testified he fired because he was scared Tapia was going to follow through with his threat and hit the oncoming car.

Tapia got out of the car. Allen then slid over, grabbed the steering wheel, and hit the brakes, avoiding a collision with the oncoming car. Allen flagged down a truck and asked for a ride. The truck driver gave Allen, Harrington, and McCammon a ride to a motel. They left Tapia and the Pathfinder in the road. Even though he had tried, Tapia never touched Allen during the drive.

A passing motorist found Tapia lying on the road. Tapia told the motorist he had been shot. The motorist called 911. Tapia was transported to a hospital where he died from his injuries. He had methamphetamine in his system. Any of the three wounds could have been fatal.

Investigators linked Harrington, Allen, and McCammon to the Pathfinder. The three were pulled over during a traffic stop the next day. Harrington had a handgun in his pocket, though it was not the weapon used to shoot Tapia.

Police downloaded information from the Pathfinder, which indicated the Pathfinder reached a top speed of almost 50 mph on Rock Road, slowing and stopping at intersections. Upon turning onto the residential street, the Pathfinder stopped three times and never moved at a speed greater than 5.3 mph.

The State charged Harrington with one count of intentional second-degree murder and two counts of criminal possession of a weapon by a convicted felon (one count for

the gun used during the shooting and one for the gun found on Harrington's person when he was arrested).

Harrington and Allen provided consistent testimony at trial. McCammon denied being there.

A jury found Harrington guilty of voluntary manslaughter based on "an unreasonable but honest belief that circumstances existed that justified use of deadly force." K.S.A. 2020 Supp. 21-5404(a)(2). The jury found Harrington guilty of both counts of criminal possession of a weapon. The sentencing court imposed a 249-month prison sentence.

*There was sufficient evidence that Harrington's honest belief in the necessity of using deadly force was unreasonable.*

The jury convicted Harrington of voluntary manslaughter "upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person." On appeal, Harrington contends the evidence did not support a finding beyond a reasonable doubt that his honest belief was unreasonable. There was no conflict in the evidence. Rather, the State's own witness testified that Tapia was high on methamphetamine, irate, driving erratically, and threatening to kill everyone in the car.

When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the prosecution to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

As applicable here, voluntary manslaughter is knowingly killing a human being "upon an unreasonable but honest belief that circumstances existed that justified use of deadly force under K.S.A. 21-5222." K.S.A. 2022 Supp. 21-5404(a)(2). This type of voluntary manslaughter is known as imperfect self-defense voluntary manslaughter. *State v. Seba*, 305 Kan. 185, 208, 380 P.3d 209 (2016). It applies when the defendant's unreasonable belief would have supported a perfect self-defense claim if it had been a reasonable belief. *State v. Roeder*, 300 Kan. 901, 924, 336 P.3d 831 (2014).

For a perfect self-defense claim, the person using deadly force must reasonably believe "that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." K.S.A. 2022 Supp. 21-5222(b). In other words, a reasonable person in the defendant's circumstances would have perceived the use of deadly force in self-defense as necessary. *State v. Keyes*, 312 Kan. 103, 109, 472 P.3d 78 (2020).

Here, Tapia threatened to kill everyone in the car. Harrington understood Tapia's threat to mean that Tapia would kill everyone by crashing the car. Tapia never displayed a weapon. Tapia was driving slowly on the residential street when Harrington fired his gun. The car data showed Tapia was not driving faster than 5.3 mph on that street and was stopping at stop signs.

There was ample evidence when viewed in a light most favorable to the prosecution that Harrington's belief deadly force was necessary to prevent imminent death or great bodily harm was unreasonable. A reasonable person would not have believed a car crash under the circumstances would result in death or great bodily harm.

*We find no reversible instruction error.*

Harrington asked the trial court to instruct the jury on the lesser included offense of involuntary manslaughter under two theories: imperfect self-defense and reckless killing. He argued the jury could convict on a theory of imperfect self-defense or on a reckless theory. The State argued against giving the reckless portion of the instruction because Harrington testified he intentionally shot Tapia. But the State agreed the imperfect self-defense portion was appropriate. The court stated it was "going to include recklessly" and that it was "going to take it directly out of the defense instructions."

The trial court gave the instruction, as proposed by Harrington:

"If you do not agree that defendant is guilty of voluntary manslaughter, you should then consider the lesser included offense of involuntary manslaughter.
"To establish this charge, each of the following claims must be proved:
1. Defendant killed Migel Angel Tapia.
2. The killing was done recklessly or during the commission of a lawful act in an unlawful manner.
3. This act occurred on or about the 17th day of August, 2020, in Sedgwick County, Kansas.
"The State must prove that defendant committed the crime recklessly. A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that a result of the defendant's actions will follow."

On appeal, Harrington argues the trial court erred by giving a portion of the instruction he proposed, specifically the last paragraph: "The State must prove that defendant committed the crime recklessly." Conviction of involuntary manslaughter under the theory of imperfect self-defense based on a lawful act committed in an unlawful manner does not require proof of a reckless killing. Harrington contends this

6

was reversible error because the jury was unable to fully consider whether involuntary manslaughter was a more appropriate conviction in this case.

The State acknowledges the jury instruction on recklessness did not distinguish between the two forms of involuntary manslaughter. The State contends Harrington invited the error. Alternatively, the State argues the error was not reversible under the clear error standard and that the skip rule applies.

We need not consider whether the error was invited because the error simply was not clear error. When the giving of or failure to give a lesser included offense instruction is challenged on appeal, we apply a multi-step process when reviewing challenges to jury instructions:

> "'First, it considers the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; next, it applies unlimited review to determine whether the instruction was legally appropriate; then, it determines whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and finally, if the district court erred, this court determines whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012).' [Citation omitted.]" *State v. Owens*, 314 Kan. 210, 235, 496 P.3d 902 (2021).

If the defendant failed to object to the instructional error below, the clear error standard is applied to assess prejudice. Instructional error is clearly erroneous when "'the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" 314 Kan. at 235. Because Harrington failed to object to the instructional error, the clear error standard applies here.

7

As applicable here, involuntary manslaughter is the killing of a human being "during the commission of a lawful act in an unlawful manner." K.S.A. 2022 Supp. 21-5405(a)(4).

The lawful act done in the unlawful manner can be self-defense. Imperfect self-defense involuntary manslaughter has been characterized as a "'lawful exercise of self-defense, but with excessive force.'" *State v. James*, 309 Kan. 1280, 1302, 443 P.3d 1063 (2019). Conviction of such offense does not require proof of a reckless or unintentional killing. *James*, 309 Kan. at 1303. If the jury concludes that some level of self-defense was necessary but that the defendant exceeded necessary force by firing a gun, the defendant would have committed a lawful act in an unlawful manner. *James*, 309 Kan. at 1304.

When the alleged lawful act under K.S.A. 2020 Supp. 21-5405(a)(4) is self-defense, "'a jury instruction on involuntary manslaughter must be supported by evidence from which a jury could find that the defendant possessed a reasonable and honest belief that physical force was required.'" *State v. Nunez*, 313 Kan. 540, 551, 486 P.3d 606 (2021).

There is a distinction between imperfect self-defense voluntary and involuntary manslaughter. Voluntary manslaughter requires a showing the accused had an unreasonable but honest belief that circumstances existed justifying deadly force. Involuntary manslaughter requires a reasonable belief that the circumstances justified force, but the exercise of the force was excessive. The *Nunez* court called these "two very different requirements." 313 Kan. at 554. A jury could find that voluntary manslaughter was not appropriate but involuntary manslaughter was appropriate. *Nunez*, 313 Kan. at 554.

8

Here, the jury could have found involuntary manslaughter was appropriate because although some degree of force was necessary to calm Tapia, Harrington exceeded necessary force by shooting him.

The skip rule does not apply. Under the "skip rule," if a jury was instructed on a lesser included offense and the jury convicts of the greater offense, the reviewing court deems any error resulting from failure to give an instruction on another still lesser included offense to be cured. 313 Kan. at 553. It is really a logical deduction rather than a rule. *Nunez*, 313 Kan. at 553. The skip rule is not amenable to mechanical application. It should be viewed as providing a route to harmlessness when the elements of the crime of conviction, as compared to the rejected lesser included crime, necessarily show the jury would have rejected a still lesser included crime. *State v. Pulliam*, 308 Kan. 1354, 1370, 430 P.3d 39 (2018).

The skip rule does not apply here because the jury did convict Harrington of a lesser included offense. Also, involuntary manslaughter has an element not contained in the other instructions. The jury might well have believed that Tapia was a threat, but that Harrington overreacted by killing him. See *Nunez*, 313 Kan. at 554.

Basically, what we must decide is whether Harrington has convinced us the jury would have reached a different verdict had the instructional error not occurred. See *Owens*, 314 Kan. at 235.

A comparison of *Nunez* and *Pulliam* is helpful at this point. In *Nunez*, the court reversed Nunez' conviction for premeditated first-degree murder because the trial court failed to give Nunez' requested instruction on imperfect self-defense involuntary manslaughter. 313 Kan. at 555. Nunez claimed the deceased attacked him with a large kitchen knife while attempting to rob him. Nunez gave conflicting accounts of what happened. But a jury could have concluded Nunez was afraid for his life after being

9

attacked. After the assailant had fallen to the ground, Nunez claimed he saw the assailant reaching for a knife. The jury could have concluded that shooting an assailant three times who had already fallen was just excessive force. The court concluded the error "may have affected the outcome of the trial because the requested instruction could have focused the attention of the jury on the legitimacy of the initial self-defense, mitigated by the subsequent exertion of unnecessary force." 313 Kan. at 555. "Without the excessive force instruction, the jury *may have seen* no other option than premeditated murder. With the instruction, the jury *could have found* that, even though the shooting was intentional, it was the result of excessive force." (Emphasis added.) 313 Kan. at 554.

The *Pulliam* court likewise found a jury *may have accepted* Pulliam's theory of imperfect self-defense involuntary manslaughter. Pulliam testified he heard a gun cock and thought he was about to be shot in the back. But the court nevertheless elected not to reverse his conviction for second-degree murder. 308 Kan. at 1369-70. Because Pulliam did not request an imperfect self-defense involuntary manslaughter instruction at trial, the review was for clear error. Under the clear error standard, Pulliam was required to firmly convince the reviewing court that the jury *would have* reached a different verdict if it had been instructed on imperfect self-defense involuntary manslaughter. The jury convicted Pulliam of second-degree murder rather than accepting his perfect self-defense or imperfect self-defense voluntary manslaughter theories. The evidence was conflicting. The court was not firmly convinced the jury would have reached a different verdict. 308 Kan. at 1369-70.

This case fits somewhere between *Nunez* and *Pulliam*. Our review is for clear error, a high burden. But, unlike in *Pulliam*, the jury did accept some portion of Harrington's self-defense theory by convicting him of voluntary manslaughter rather than second-degree murder.

10

We find Harrington did not meet his burden to firmly convince us the jury would have reached a different result if the instruction did not say, "The State must prove that defendant committed the crime recklessly." Harrington has not explained why involuntary manslaughter was more appropriate than voluntary manslaughter. And, unlike *Nunez*, the court did not omit the instruction entirely. The trial court did instruct the jury it could find Harrington guilty of imperfect self-defense involuntary manslaughter. The alleged error was that the court said, "The State must prove that defendant committed the crime recklessly." True, involuntary manslaughter can be committed intentionally. But "[i]f recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally." K.S.A. 2022 Supp. 21-5202(c). Harrington has not shown how the recklessness element prejudiced him.

*The trial court did not err in its ruling concerning Harrington's gang ties.*

Harrington argues the trial court erred by ruling that introducing evidence Tapia had threatened to get his "gang" would open the door to evidence that Harrington was a gang member. Tapia's use of the word "gang" was relevant to his defense to accurately convey the violent and serious nature of the threat. He argues the trial court erred by failing to analyze whether his own gang activities were admissible under K.S.A. 60-455.

Harrington reads the trial court's ruling too broadly. The trial court did not rule the "'open the door'" rule applied nor did the court exclude evidence that Tapia had threatened to get his gang. The court simply denied Harrington's motion in limine concerning evidence of his own gang ties after defense counsel did not explain why such evidence was more prejudicial than probative.

Before trial, Harrington filed a motion in limine asking the court to prohibit any witness from commenting or implying that Harrington "is or has been a gang member."

11

He argued such testimony would be improper and unduly prejudicial. The State argued that if Harrington introduced evidence that Tapia was a gang member then the State should be able to introduce evidence that Harrington was a gang member. Harrington argued that Tapia's statement should be admissible without bringing up Harrington's gang membership to show his state of mind at the time of the shooting. The court asked defense counsel if she had any caselaw to support her claim that evidence of Harrington's gang ties was more prejudicial than probative. She did not. She did not ask the court to apply K.S.A. 60-455. The court ruled, "Given the facts of this case I am going to not sustain that portion of the defense motion in limine." In other words, the court did not exclude evidence that Harrington was a gang member.

During trial, before Allen's testimony, the prosecutor advised the court that she and defense counsel spoke to Allen and told Allen not to discuss gang evidence with respect to Harrington or Tapia. The court was not a party to the discussion with Allen. While Allen was testifying, defense counsel asked Allen if she recalled Tapia saying he was going to get his "crew." She responded, yes.

"[E]vidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." K.S.A. 2022 Supp. 60-455(a).

Harrington is correct that the "open the door" rule does not permit admission of evidence of other crimes or civil wrongs independent of K.S.A. 60-455. *State v. Everett*, 296 Kan. 1039, 1045, 297 P.3d 292 (2013) (holding the trial court should have conducted an analysis under K.S.A. 60-455 before admitting evidence of Everett's prior conviction).

But the trial court was not required to sua sponte invoke K.S.A. 60-455 because it did not apply. While evidence of gang membership may be prejudicial to a defendant just

12

as any other evidence offered against a defendant, evidence of gang membership is not evidence of a crime or civil wrong under K.S.A. 60-455. Such evidence is admissible if relevant. *State v. Sieg*, 315 Kan. 526, 533, 509 P.3d 535 (2022); *State v. Jones*, 295 Kan. 804, 810, 286 P.3d 562 (2012).

*The prosecutor's comments do not amount to reversible error.*

Basically, appellate courts use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *Sherman*, 305 Kan. at 109.

We will review a prosecutorial error claim based on a prosecutor's comments made during closing argument even without a timely objection, but the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

A prosecutor commits error by misstating the law. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021); *State v. Magallanez*, 290 Kan. 906, 915, 235 P.3d 460 (2010) (misrepresentation of burden of proof in closing argument).

*Burden shift*

Harrington argues the State misstated the law and insinuated he had the burden to prove his use of force was justified by stating:

> "So what is left to decide? The questions that remain for you are was the killing done intentionally and was the killing justified by self-defense or defense of another. If you believe that the killing was justified, that the use of deadly force was justified by self-defense then you are done on that count. He is not guilty. But I submit that the evidence shows that it absolutely was not self-defense."

The State ended with, "I ask that you find . . . that this killing was not justified by self-defense and ask that you find that the evidence shows that the defendant is guilty beyond a reasonable doubt."

Harrington contends these statements misstate the law because the jury merely had to possess a reasonable doubt that he was not acting in self-defense to acquit. The State improperly conflated who had the burden of proof.

The law is well-settled on these points. It is improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the law. *State v. Williams*, 299 Kan. 911, 939, 329 P.3d 400 (2014). Once a defendant properly asserts a self-defense affirmative defense, the State must disprove that defense beyond a reasonable doubt. K.S.A. 2022 Supp. 21-5108(c); *State v. Staten*, 304 Kan. 957, 965, 377 P.3d 427 (2016).

14

The prosecutor did not say that Harrington had to prove he acted in self-defense or that the jury had to believe his self-defense theory to acquit him. The prosecutor merely stated that if the jurors did believe Harrington acted in self-defense, then they had to acquit him. There was no misstatement of the law.

Moreover, the jury was properly instructed, "The State has the burden to disprove [self-]defense beyond a reasonable doubt. The State's burden of proof does not shift to the defendant."

We find no error here.

*Duty to retreat*

Harrington next contends the State improperly commented that Harrington could have retreated. The State argued:

"So now the next question is was it self-defense? The evidence shows, ladies and gentlemen, that this was not self-defense. Consider that they are at the gas station. You have a video from the Phillips 66 from the time they pull [in] to the time they leave. The defendant and Neosha both testified that Miguel starts getting upset after he paid for the gas. There is quite an amount of time, as you can see on the video, where they are all sitting there in that car and none of those three not Neosha, not Jewel, not the defendant left. They wanted to go to the motel, but they didn't get out of the car and walk the mile. They didn't get out of the car and flag anyone down at that point to give them a ride. They stayed in the car.

. . . .

"Consider the video from Phillips 66. Again, pulls in about 7:00 A.M. It showed Miguel getting out of the Pathfinder. Showed the vehicle parked for a long period of time . . . . Nobody got out. Remember, that is when Neosha and the defendant both say he is getting irate. He is getting angry. They want to go back to the motel. They are telling him just take us back to the motel. They don't get out."

15

Harrington contends the prosecutor misstated the law by arguing that he did not act in self-defense because he could have retreated by getting out of the vehicle. He argues he had no duty to retreat.

The State agrees a person lawfully using force in self-defense is not required to retreat but contends the prosecutor did not suggest otherwise. The State argues the prosecutor was not addressing the legal requirements of self-defense but was instead discussing the evidence and arguing the evidence was inconsistent with self-defense.

The Kansas defense of a person statute provides: "Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person." K.S.A. 2022 Supp. 21-5222(c).

A prosecutor may not imply the defendant had a duty to retreat contrary to the judge's instructions to the jury. See *State v. Adams*, 292 Kan. 60, 73-75, 253 P.3d 5 (2011). In *Adams*, the prosecutor stated, "'This sure as heck would have been a different situation if the defendant had just walked away. He could have gone to the bouncers, he could have run to the parking garage.'" 292 Kan. at 73. Our Supreme Court concluded the prosecutor's statement implied a duty to retreat contrary to the judge's instruction to the jury and was thus improper. 292 Kan. at 74.

The prosecutor may argue the evidence is inconsistent with the defense theory of self-defense. See *State v. Haygood*, 308 Kan. 1387, 1401, 430 P.3d 11 (2018). In *State v. Jameson*, No. 123,343, 2022 WL 628704, at *10 (Kan. App.) (unpublished opinion), *rev. denied* 316 Kan. 761 (2022), the prosecutor said,

> "'The defendant claims his conduct was permitted as a lawful defense of his dwelling. . . . Reasonable belief requires both a belief by the defendant and the existence of facts that

16

would persuade a reasonable person to that belief. Hello. He could have shut the door and locked it. How do we know it? Because he did it, again and again, and then he chose to open the door and go out and confront [Fadden].'"

The panel concluded the prosecutor never implied Jameson had a duty to retreat. 2022 WL 628704, at *11-12. Instead, the prosecutor asked the jury to use its common sense when evaluating the believability of Jameson's testimony in light of the fact he did repeatedly retreat into his house and lock the door after battering Fadden. Jameson's ability to retreat into his house suggested Fadden was not about to use imminent unlawful force against Jameson. 2022 WL 628704, at *11-12.

Here, the jury was instructed, "When use of force is permitted as self-defense or defense of someone else, there is no requirement to retreat."

The prosecutor erred. The prosecutor's comments implied that Harrington did not act in self-defense by shooting Tapia because, back at the gas station, Harrington could have stepped out of the car and walked back to the motel.

But the error was harmless. The prosecutor's comments related to the time before the need for self-defense arose—when the car was sitting stationary at the gas station. The jury was properly instructed there is no requirement to retreat once self-defense is lawfully permitted.

*Lesser forms of force*

Harrington contends the prosecutor erred by arguing he could have used lesser forms of force. The prosecutor stated,

17

"Let's first consider whether it was intentional. Think about what he testified to. . . . There was this argument going on, right? . . . They were getting frustrated with him. Do you think emotions were building at that point? What did the defendant do by his own words? Well, I tried to get in between them. He didn't punch him. He didn't grab him. He pulled a gun on him. And he didn't just pull the gun. He fired. He fired that gun four times. How do we know that? He says, well, I remember one or two. . . . Four times he fired that gun. Three struck Miguel. He didn't fire at the ground. He didn't fire out the window that he was sitting next to. He fired right at Miguel."

Harrington contends Kansas does not require a person to use the least severe possible force.

Context is important. "[I]t is incumbent on a reviewing court to consider a prosecutor's comments in the context in which they are made, not in isolation." *Haygood*, 308 Kan. at 1399. Here, the prosecutor was not discussing self-defense. The prosecutor was arguing the shooting was intentional, an element of the second-degree murder charge. The prosecutor then moved on to self-defense after she made those comments. Moreover, the level of force can be important. A person is only justified in using *deadly* force when necessary to prevent imminent death or great bodily harm. K.S.A. 2022 Supp. 21-5222(b).

We find no error here.

*Physical contact or harm*

Harrington contends the prosecutor improperly insinuated there was no self-defense because Allen was not physically touched or harmed. The prosecutor said,

"So now the next question is was it self-defense? . . . Miguel didn't strike Neosha Allen at all. She was asked a couple of times did he ever hit you. Did he ever put his hands on you. Her response was no. He didn't touch her."

18

Harrington contends the prosecutor misstated the law because physical harm is not required before the use of deadly force is justified.

Again, context is important. *Haygood*, 308 Kan. at 1399. The prosecutor never stated or implied that Tapia had to touch or physically harm any of the passengers before self-defense was justified. Rather, the prosecutor engaged in a lengthy recitation of the facts that were inconsistent with Harrington's self-defense theory. Tapia's actions toward Allen were relevant to whether Harrington had an honest and reasonable belief that deadly force was necessary to protect her. See K.S.A. 2022 Supp. 21-5222.

We find no error here.

*The trial court did not err in instructing the jury regarding the shell casings found in the Pathfinder.*

At trial, the State questioned Detective Timothy Relph about his investigation into who shot Tapia. The State asked whether the shell casings found in the Pathfinder involved in this incident matched other casings in the police database (the NIBIN system). The defense objected. The following exchange occurred:

> "Q.    So in this case when you put in the casings collected by Investigator Weller into NIBIN, did you receive information that the NIBIN system found other casings submitted that matched the casings you submitted?
>
>    "MR. FOX:  I am going to object. That's hearsay.
>
>    "MS. SCHAUF:  Judge, it's just going—it is not being offered for the truth of the matter. It is just going to show why Detective Relph does what he does further on in the investigation.
>
>    "THE COURT:  Overruled for that purpose only.

19

"MR. FOX: I would ask the jury be instructed it is only being admitted for that reason, Your Honor.

"THE COURT: I just made that ruling. The jury was here to hear it.

"MR. FOX: Thank you.

"Q. (By Ms. Schauf) Did you receive information that the casings from your case, the death of Mr. Tapia, that they matched or had similar tool marking characteristics of casings collected in another incident?

"A. Yes. There was a presumptive—they call it a presumptive match. It is really just a likely match would be more accurate."

Detective Relph testified he talked to a detective involved in the other case and got the description of a vehicle involved in that incident. The tag on that vehicle was registered to McCammon. The detective then began looking for McCammon.

Prior to trial, at the hearing on Harrington's motion in limine, defense counsel agreed that the State could refer to the casings from the prior incident so long as there was no discussion of the suspects in that case. There was not.

On appeal, Harrington contends the trial court never articulated for what purpose the jury could consider the detective's testimony. Thus, the jury was not prohibited from considering the evidence of the prior shooting for the truth of the matter asserted, which was inherently prejudicial prior bad act evidence.

"When relevant evidence is admissible as to one party or for one purpose and is inadmissible as to other parties or for another purpose, the judge upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." K.S.A. 60-406.

Taken in context, the jury was instructed as the defense requested. The State said the testimony was "just going to show why Detective Relph does what he does further on in the investigation." If the jury missed the meaning of the court's ruling, it was made

20

clear by the further exchange. When defense counsel asked the court to instruct the jury the testimony was only admitted for the reason articulated by the State, the court stated it had already made that ruling. Thus, the jurors were informed for what purpose the evidence was admitted.

Moreover, this was not prior bad acts evidence because the detective did not connect the prior shooting to Harrington. Rather, the detective testified the vehicle connected to the other incident led to McCammon. It was not evidence that Harrington had committed another crime on a specified occasion. Tellingly, the defense did not even object on K.S.A. 60-455 grounds at trial.

We find no error here.

*The trial court's failure to give certain limiting instructions was not reversible error.*

Harrington contends the trial court erred by failing to give a limiting instruction concerning prior bad act evidence of illegal drug use and the previous shooting incident. He contends the failure to give the instruction was reversible error because his credibility was critical to his defense. Based on the evidence admitted, the jury could have believed he had a propensity to commit crimes.

If prior crimes evidence is admitted under K.S.A. 60-455 in a jury trial, a limiting instruction must be provided to inform the jury of the specific purpose for which the evidence was admitted. *Haygood*, 308 Kan. at 1394. The purpose of the limiting instruction is to eliminate the danger that the evidence will be considered to prove the defendant's propensity to commit the charged crime. *State v. Breeden*, 297 Kan. 567, 582, 304 P.3d 660 (2013).

21

The failure to object to the admission of K.S.A. 60-455 evidence does not waive the right to argue on appeal that the failure to give a limiting instruction was clearly erroneous. *Breeden*, 297 Kan. at 582-83. The court first considers whether a limiting instruction was legally and factually appropriate. 297 Kan. at 584.

*Drug use*

The State presented evidence through Allen that Harrington was using methamphetamine at the hotel. Harrington did not object to this evidence or ask for a limiting instruction. Harrington also testified he was using methamphetamine whenever he could during that timeframe.

"[T]he first question is whether K.S.A. 60-455 has any bearing on the evidence at all." *Sieg*, 315 Kan. at 534. "K.S.A. 60-455 does not prohibit the admission of evidence about other crimes and civil wrongs if the evidence relates to acts committed as part of the events surrounding the crimes or civil wrongs at issue in the trial." *Sieg*, 315 Kan. 526, Syl. ¶ 2.

The evidence concerning Harrington's drug use went beyond the events surrounding this crime. Harrington's drug use qualifies as evidence of other crimes or civil wrongs. See *State v. Butler*, 307 Kan. 831, 862, 416 P.3d 116 (2018); *State v. Garcia*, No. 121,045, 2022 WL 2392500, at *6 (Kan. App. 2022) (unpublished opinion), *rev. denied* 317 Kan. ___ (March 29, 2023).

But Harrington has not shown the jury would have reached a different verdict had a limiting instruction been given. The jury did find Harrington credible. There was no dispute Harrington shot Tapia. The issue was whether Harrington acted in self-defense. The jury found Harrington guilty of voluntary manslaughter based on an "unreasonable but honest belief that circumstances existed that justified deadly force." In other words,

22

the jury believed Harrington was telling the truth, but the circumstances did not justify deadly force.

*Other shooting*

The State presented evidence through Detective Relph that the casings found in the Pathfinder matched casings collected from another incident that occurred in August 2020, as explained above.

As explained above, Detective Relph never testified Harrington was involved in the prior shooting. This does not qualify as K.S.A. 60-455 evidence. It was not evidence Harrington committed a crime on a specified occasion. A limiting instruction was not required.

*Cumulative error did not deprive Harrington of a fair trial.*

Harrington contends the cumulative effect of the errors denied him a fair trial.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when all the circumstances establish the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional in nature, the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022). The cumulative error rule does not apply if there are no errors or only a single error. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

23

There were errors in the prosecutor's statement that Harrington could have retreated and the court's failure to give a limiting instruction concerning Harrington's drug use. But the jury was properly instructed that Harrington did not have a duty to retreat. At trial, Harrington and Allen gave consistent testimony. There was only one version of events. The jury found Harrington was honest, but that the circumstances did not justify deadly force.

*The sentencing court improperly included a criminal threat conviction in Harrington's criminal history.*

Harrington contends his sentence is illegal because the trial court improperly included his prior criminal threat conviction in his criminal history, raising his criminal history score from B to A. The PSI did not specify whether the criminal threat was reckless or intentional.

The criminal threat statute read: "A criminal threat is any threat to . . . Commit violence communicated with intent to place another in fear, . . . or in reckless disregard of the risk of causing such fear." K.S.A. 2014 Supp. 21-5415(a)(1).

A reckless criminal threat has been described as one simply spoken "in the heat of argument and the result of unthinking rage—more reckless, impulsive bluster than an intentional threat." *State v. Lindemuth*, 312 Kan. 12, 18, 470 P.3d 1279 (2020).

The reckless form of criminal threat was found unconstitutionally overbroad in *State v. Boettger*, 310 Kan. 800, 450 P.3d 805 (2019). "The portion of K.S.A. 2018 Supp. 21-5415(a)(1) allowing for a conviction if a threat of violence is made in reckless disregard for causing fear is unconstitutionally overbroad because it punishes conduct

24

that may be constitutionally protected under some circumstances." 310 Kan. 800, Syl. ¶ 3.

"Prior convictions of a crime defined by a statute that has since been determined unconstitutional by an appellate court shall not be used for criminal history scoring purposes." K.S.A. 2022 Supp. 21-6810(d)(9).

The State included a May 2015 conviction for criminal threat in Harrington's criminal history. The presentence report referred to K.S.A. 21-5415 and case number "14CR2843." The report characterized the conviction as a person felony. With three prior person felonies, the State alleged Harrington's criminal history score was A. See K.S.A. 2022 Supp. 21-6804.

Harrington objected to the criminal history score. The State responded with a transcript of the plea hearing from the criminal threat case. The factual basis offered for his no contest plea was that on October 22, 2014, when Harrington was appearing in front of Judge Abbot:

> "He became agitated, called the judge a name, got aggressive with him, and ultimately threatened the judge with the statement specifically, that when he sees the judge on the streets, he is going to fuck my ass up, because I am a fucking pussy.
>     "The judge indicate[d] that he felt threatened for his health and safety, and that it took two bailiffs to escort Mr. Harrington back to the holding cell."

Harrington explained, "I was in court and I got so mad I blacked out. I don't even remember [what] I was doing, but I remember certain parts of it. . . . I went in front of Judge Abbot and then I blacked out. Him and me got into . . . a verbal altercation." Back in county jail, he was prescribed Depakote.

At the sentencing hearing in the present case, the trial court considered the plea transcript from case number 14CR2843 and ruled that Harrington's threat was intentional because Harrington was mad at the judge and made a very specific threat. Thus, the trial court included the criminal threat conviction in calculating Harrington's criminal history score, raising his score to A.

Whether a sentence is illegal is a question of law over which appellate courts have unlimited review. *State v. Mitchell*, 315 Kan. 156, 158, 505 P.3d 739 (2022). Whether the prior criminal threat conviction can be counted in Harrington's criminal history is a question of law over which this court has unlimited review. See *State v. Martinez-Guerrero*, No. 123,447, 2022 WL 68543, at *4 (Kan. App. 2022) (unpublished opinion).

When a defendant exercises the statutory right to challenge the accuracy of the convictions contained in his criminal history worksheet, the State bears the burden to prove by a preponderance of the evidence that the defendant committed the crime. K.S.A. 2022 Supp. 21-6814(c); *State v. Corby*, 314 Kan. 794, 797, 502 P.3d 111 (2022). It follows that the State must prove the challenged convictions are not under a statute that has since been determined unconstitutional. *State v. Jackson*, No. 124,271, 2022 WL 1906940, at *4 (Kan. App.) (unpublished opinion), *rev. denied* 316 Kan. 761 (2022).

In determining whether prior offenses may be used as a person felony or otherwise used to enhance a defendant's sentence, the district court is constitutionally prohibited from making additional factual findings beyond simply identifying the statutory elements of the prior offense. *State v. Dickey*, 301 Kan. 1018, 1038-39, 350 P.3d 1054 (2015); *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

Problems arise when the criminal statute a defendant previously violated is divisible—i.e., comprises multiple, alternative versions of the same crime—and a later sentencing court cannot tell which alternative was the basis of the defendant's conviction.

In such case, the sentencing court is permitted to look beyond the statutory elements and examine "'a limited class of documents to determine which of a statute's alternative elements formed the basis of the defendant's prior conviction.'" *State v. Obregon*, 309 Kan. 1267, 1274, 444 P.3d 331 (2019). Those documents include "'charging documents, plea agreements, transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, and jury instructions and verdict forms.'" 309 Kan. at 1274. This is referred to as the "'modified categorical approach.'" 309 Kan. at 1273-74.

The purpose for which those documents may be consulted is also limited. *State v. Gensler*, 308 Kan. 674, 682-83, 423 P.3d 488 (2018) (citing *Descamps v. United States*, 570 U.S. 254, 261, 133 S. Ct. 2276, 186 L. Ed. 2d 438 [2013]). The sentencing court is not permitted to engage in fact-finding to determine whether the defendant could have been convicted of a particular crime based on the defendant's actions. The modified categorical approach is an elements-based inquiry not an evidence-based one. *Descamps*, 570 U.S. at 266-68. The sentencing court may not "'make a disputed' determination 'about what the defendant and state judge must have understood as the factual basis of the prior plea.'" 570 U.S. at 269. The court may only assess what version of the crime the defendant pled to. The modified categorical approach is a tool, not an exception to the categorical approach. 570 U.S. at 262-63. "The categorical approach and modified categorical approach described in *Descamps* ensure that sentencing courts, when examining a prior conviction for sentencing purposes, do not engage in fact-finding in violation of *Apprendi*." *Dickey*, 301 Kan. at 1038.

Here, the trial court improperly made findings of fact beyond simply identifying the elements of the prior crime. It was unclear from the plea colloquy whether Harrington was convicted of making a reckless or intentional threat. The trial court made an inference that because Harrington was mad at the judge and his threat was very specific, that the threat was intentional. This judicial inference was fact-finding and is not permitted.

27

Several panels of this court have concluded that an offender's prior criminal threat conviction could not be included in the offender's criminal history under similar circumstances. In *Martinez-Guerrero*, the panel reasoned that although Martinez-Guerrero's threat to shoot an officer was direct and made in close proximity, the evidence from the plea hearing transcript did not establish whether Martinez-Guerrero "actually intended to threaten Officer Chase or whether it was a comment made in the heat of the moment or in anger over what Martinez-Guerrero thought was an unlawful arrest. Nor is there any evidence in the record that Officer Chase experienced any fear from Martinez-Guerrero's threat." 2022 WL 68543, at *6. Thus, the criminal threat conviction could not be included in Martinez-Guerrero's criminal history. 2022 WL 68543, at *6.

In *State v. Jackson*, 2022 WL 1906940, at *5, another panel upheld the trial court's determination that the plea transcripts did not establish which version of criminal threat Jackson committed. "Jackson could have intended his statements to be a threat—supporting an intentional version of the offense—or he could have simply made the statements in the heat of the moment or in anger without intending them to be a threat—supporting a reckless version of the offense." 2022 WL 1906940, at *5. Thus, the trial court correctly found that the convictions could not be included in his criminal history score. 2022 WL 1906940, at *5.

In *State v. Degand*, 63 Kan. App. 2d 457, 463, 530 P.3d 439 (2023), *rev. denied* 317 Kan. ___ (October 25, 2023), another panel similarly concluded the plea transcript was "not enough to establish whether Degand made those comments in the heat of the moment or that he actually intended to threaten the officers."

There is nothing in this record that shows whether Harrington made a reckless or intentional threat. Thus, the conviction should not have been included in his criminal history score.

28

We affirm Harrington's conviction, but remand to the trial court for resentencing based on the correct criminal history score.

Conviction affirmed, sentence vacated, and case remanded with directions.